[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11161

_____

D.C. Docket Nos. 1:16-cv-23880-WJZ; 1:06-cr-20592-WJZ-4

MARIO BACHILLER,

Petitioner - Appellant,

versus

UNITED STATES OF AMERICA,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 20, 2021)

Before JILL PRYOR, NEWSOM and MARCUS, Circuit Judges.

PER CURIAM:

Mario Bachiller was ensnared in a reverse sting operation during which he and several codefendants attempted to rob a tractor-trailer truck purportedly carrying 80 kilograms of cocaine. A jury convicted him of, among other offenses, carrying a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c). We affirmed his convictions and sentence on direct appeal, *see United States v. Gomez*, 302 F. App'x 868 (11th Cir. 2008) (unpublished), but after a series of relevant decisions from the Supreme Court of the United States, his case has returned to us, this time in the form of an appeal from the denial of his 28 U.S.C. § 2255 motion to vacate his § 924(c) sentence. After careful review, and with the benefit of oral argument, we affirm.

I.

These are the essential facts of Bachiller's conviction. Federal law enforcement agents received information from a confidential informant that a man named Nelson Peña was interested in robbing a drug stash house. Under the supervision of federal agents, the CI arranged a meeting with Peña. At that meeting, a second confidential informant (the "CI") told Peña that he was looking for people to steal cocaine stashed in a tractor-trailer, Peña said he was willing to commit the robbery, and the two discussed some details, including that Peña would

"get some guys" to commit the robbery with him. Crim. Doc. 272-1 at 177.[1] Peña then called Reynaldo Aviles, Aviles called Emilio Gomez, and Gomez called Bachiller.

A few days later, the CI and Peña met to discuss more concrete plans for the robbery: the CI told Peña he expected the tractor-trailer to contain 80 kilograms of cocaine, and Peña assured the CI that his crew was trustworthy. Immediately before and after that meeting, Peña called Gomez, and later that day Bachiller called Gomez.

The CI eventually met with Aviles and Gomez but not Bachiller. During the meeting, the CI gave Peña, Aviles, and Gomez details about the tractor-trailer truck, its drivers, the location of the drugs, how the robbery would take place, and how the men would divide the drugs afterwards. When Gomez asked whether the drivers of the truck would be armed, the CI told the men that they "have to take [their] equipment"—meaning firearms—because he couldn't "guarantee how those people are going to react." Crim. Doc. 273-1 at 48. Gomez also suggested that the men commit the robbery dressed as police. Within an hour after the meeting concluded, Aviles called Bachiller twice, Gomez called Bachiller twice, and Bachiller called Gomez.

---

[1] "Crim. Doc." numbers refer to the district court's docket entries in Bachiller's underlying criminal case, S.D. Fla. No. 1:06-cr-20592.

3

The next day, the day of the robbery, the CI, Peña, and Aviles met to discuss final details of the robbery plan. Immediately before the meeting, Peña, Gomez, and Bachiller made a flurry of phone calls: Peña called Gomez twice, then Gomez immediately called Bachiller, then Peña called Gomez again, then Bachiller called Gomez. Over the course of the hour after the meeting, numerous phone calls were made among Peña, Guevara, Aviles, Gomez, and Bachiller. Guevara's friend Jorge Torres also joined the crew.

That evening, Peña and his crew gathered three or four times at Torres's house to "g[e]t everything ready, the guns and stuff." Crim. Doc. 274-1 at 169. They discussed their plan to wear police shirts and to shout "Police!" as they approached the tractor-trailer. Aviles and Peña provided crew members with police shirts, walkie-talkies, and flashlights. Bachiller arrived at the last of these meetings and parked his car outside Torres's house. At the meeting, according to Guevara, Bachiller "started asking how the stuff was going to happen." Crim. Doc. 274-1 at 171. Peña and Aviles explained to Bachiller that they were going to "ripoff the truck and get the cocaine. Everybody's going to get their cut. We're gonna scream out 'police' and everybody go their way." *Id.* at 173. Bachiller also was told the crew planned to use firearms to commit the robbery, and Torres put a loaded 12-gauge shotgun in the backseat of the Cadillac he, Bachiller, and Guevara

would drive to the robbery.  A few minutes after 10:00 p.m., Peña called the CI to tell him that the crew was assembled, ready, and waiting.

Approximately 50 minutes later, Peña, Gomez, and Aviles drove to meet the CI one final time for a drive-by of the parked tractor-trailer.  While en route, Aviles called Bachiller three times.  Peña, Gomez, and Aviles met up with the CI and drove by the tractor-trailer in the CI's car.  Peña told the CI that they planned to bring firearms and use two or three cars to carry out the robbery.  At the conclusion of the meeting, Peña, Gomez, and Aviles drove away in Gomez's car.  The three men drove back to Torres's house, and on the way Aviles called Bachiller, who was at Torres's house or nearby.

Torres and Guevara left Torres's house in the Cadillac, and at some point Bachiller joined them, sitting in the back seat.  Torres and Guevara told Bachiller he was "sitting on top of the gun and it was loaded."  Crim. Doc. 274-1 at 196.  A little after midnight, the occupants of the Cadillac and their other crew members, split between two cars, convened at the tractor-trailer's location, all the while talking on the phone with one another.  When they arrived at the entrance of the parking lot, Torres, Guevara, and Bachiller donned the police shirts.  Several of the crew members exited their cars; Guevara and Torres, armed with a firearm, approached the tractor-trailer, and Torres opened the tractor-trailer's door as Aviles yelled "police, police" from behind the trunk of his car.  Agents immediately

seized the men, shooting Guevara and Torres in the process. Torres died as a result of his wounds. When agents arrested Bachiller they found him in possession of a notebook with Gomez's cell phone number written in it and keys to the car parked outside Torres's house. Bachiller's cell phone was recovered underneath the gun in the backseat of the Cadillac.

A grand jury returned an indictment charging Bachiller and his codefendants with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 846 (Count 1); attempted possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 846, and 18 U.S.C. § 2 (Count 2); conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 3); attempted Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a), 2 (Count 4); knowingly carrying a firearm during and in relation to a crime of violence and drug trafficking crime, and possessing a firearm in furtherance thereof, as set forth in Counts 1, 2, 3, and 4, in violation of 18 U.S.C. §§ 924(c)(1)(A), 2 (Count 5); and possessing a firearm and ammunition as a person previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (Count 6). At trial, the government presented the evidence described above. Bachiller testified in his defense that he hitched a ride with Guevara and Torres not knowing that they had planned to commit a robbery, that he was forced at gunpoint to don

6

the police shirt, and that he tried to escape when he arrived at the scene.  He acknowledged having previously been convicted of several felony offenses.

Before the case went to the jury, the district court instructed that Bachiller could be guilty of Count 5 if he (1) "committed a drug trafficking offense *or* crime of violence charged in Count 1, 2, 3, or 4" and (2) "during the commission of that offense" he either "knowingly carried a firearm in relation to that drug trafficking crime *or* crime of violence" or "knowingly possessed the firearm in furtherance of that drug trafficking crime *or* crime of violence."  Crim. Doc. 204 at 19 (emphasis added).[2]  The court further instructed that although it was "sufficient if the [g]overnment prove[d], beyond a reasonable doubt, that [Bachiller] knowingly violated the law in *either* way," the jury "must unanimously agree upon the way in which [Bachiller] committed the violation."  *Id.* at 20.  The jury returned a general verdict finding Bachiller guilty on all counts.  The district court sentenced him to a

---

[2] Section 924(c) provides, "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," shall receive an additional term of imprisonment.  18 U.S.C. § 924(c)(1)(A).  A "crime of violence" means any offense that is a felony and that:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3).  Generally we refer to subsection (A) as the "elements clause" and subsection (B) as the "residual clause."  A "drug trafficking crime" is, as relevant here, "any felony punishable under the Controlled Substances Act," *id.* § 924(c)(2), which includes the drug offenses in Counts 1 and 2 of Bachiller's indictment.

term of life imprisonment, which included a consecutive 84-month sentence for Count 5.

Bachiller appealed, and we affirmed his convictions and sentence. *Gomez*, 302 F. App'x at 869–70. He did not argue that his § 924(c) conviction was based on an invalid predicate offense. Bachiller filed an initial § 2255 motion raising issues not relevant here; again, he did not challenge his § 924(c) conviction based on the predicate on which it was based. His motion was unsuccessful.

Proceeding *pro se*, Bachiller sought leave to file the instant § 2255 motion, and we granted him leave to do so. In this § 2255 motion, Bachiller claimed that his Count 5 § 924(c) conviction must be vacated because it may have been predicated on conspiracy to commit Hobbs Act robbery, an offense that qualified as a crime of violence only under § 924(c)'s residual clause.[3] And, he argued, the residual clause of § 924(c) was invalid under *Johnson v. United States*, 576 U.S. 591, 597 (2015), which invalidated a similar residual clause in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii). The government opposed Bachiller's motion, arguing that *Johnson* did not invalidate § 924(c)'s residual clause and that, even if *Johnson* applied, Bachiller procedurally defaulted his claim

---

[3] At the time he received authorization to file a new § 2255 motion, we had not yet decided whether conspiracy to commit Hobbs Act robbery qualified as a crime of violence only under § 924(c)'s residual clause. Since then, we have held that conspiracy to commit Hobbs Act robbery can qualify as a crime of violence only under that definition. *See Brown v. United States*, 942 F.3d 1069, 1075 (11th Cir. 2019).

8

by failing to raise it during his trial proceedings or on direct appeal.  The district court denied Bachiller relief.  With respect to the government's assertion of procedural default, the court explained that Bachiller had demonstrated cause to excuse the default but could not show prejudice because *Johnson* did not invalidate § 924(c)'s residual clause.

This Court denied Bachiller a certificate of appealability because, at the time, the district court's decision was in accord with circuit precedent.  *See Ovalles v. United States*, 905 F.3d 1231, 1252 (11th Cir. 2018) (en banc), *abrogated by Davis v. United States*, 139 S. Ct. 2319 (2019).  Bachiller sought review in the Supreme Court.  While his petition for a writ of certiorari was pending, the Supreme Court held that § 924(c)'s residual clause was void for vagueness for the same reasons that ACCA's residual clause was void.  *See Davis*, 139 S. Ct. at 2336.  The Supreme Court granted Bachiller's petition for review, vacated this Court's judgment, and remanded for further consideration in light of *Davis*.  *See Bachiller v. United States*, 140 S. Ct. 101 (2019).  On remand, this Court granted Bachiller a certificate of appealability on his claim that his § 924(c) conviction is now invalid after *Davis*.[4]

---

[4] We have jurisdiction to entertain Bachiller's *Davis* claim even though we originally granted him authorization to file a claim based on *Johnson*.  *See Granda v. United States*, 990 F.3d 1272, 1283–84 (11th Cir. 2021).

On remand from the Supreme Court, this Court granted Bachiller a certificate of appealability on "[w]hether, considering . . . *Davis* . . . , the district court erred in dismissing

9

II.

Bachiller challenges his Count 5 conviction on the ground that it may have rested on an invalid predicate, conspiracy to commit Hobbs Act robbery. *See Brown v. United States*, 942 F.3d 1069, 1075 (11th Cir. 2019). He acknowledges that the jury may instead have based it on a valid predicate—the Count 1 and 2 drug trafficking offenses or the Count 4 attempted Hobbs Act robbery—but argues that the indictment, general verdict, and jury instructions do not demonstrate as much, so we must vacate his conviction. The government in turn argues that Bachiller's claim is subject to a procedural default and he cannot establish cause and prejudice or actual innocence such that we can excuse that default. In response, Bachiller asserts that his claim is jurisdictional in nature and therefore not subject to a procedural default. He further argues that even if his claim would have been subject to a procedural default, the government waived the defense by failing to challenge the district court's finding of cause.

We need not resolve the parties' dispute over whether Bachiller's claim is procedurally defaulted because his claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("As we have said many times and as the Supreme Court has held, a federal court may skip over the procedural default

---

Bachiller's 28 U.S.C. § 2255 motion." The question of whether Bachiller's *Davis* claim is procedurally defaulted is a "threshold ruling" that his certificate of appealability necessarily encompasses. *Wright v. Sec'y, Dep't of Corr.*, 278 F.3d 1245, 1258 (11th Cir. 2002).

analysis if a claim would fail on the merits in any event.").  The Hobbs Act

conspiracy for which Bachiller was convicted was "inextricably intertwined" with

the drug trafficking convictions that remain valid § 924(c) predicate offenses after

*Davis*.  *Granda v. United States*, 990 F.3d 1272, 1293 (11th Cir. 2021).  Thus, "the

inclusion of an invalid predicate offense—the Hobbs Act conspiracy—in his

indictment and jury instructions was harmless."  *Foster v. United States*, No. 19-

14771, __ F.3d __, 2021 WL 1742267, at *5 (11th Cir. May 4, 2021).

"On collateral review, the harmless error standard mandates that 'relief is

proper only if the court has grave doubt about whether a trial error of federal law

had substantial and injurious effect or influence in determining the jury's verdict.'"

*Granda*, 990 F.3d at 1292 (alteration adopted) (quoting *Davis v. Ayala*, 576 U.S.

257, 267–68 (2015)).  "There must be more than a 'reasonable possibility' that the

error was harmful.'"  *Davis*, 576 U.S. at 268 (quoting *Brecht v. Abrahamson*, 507

U.S. 619, 637 (1993)).  "Put another way, the court may order relief only if the

error 'resulted in actual prejudice.'"  *Granda*, 990 F.3d at 1292 (quoting *Brecht*,

507 U.S. at 637).  We must "ask directly whether the error substantially influenced

the jury's decision," and if we "cannot say, with fair assurance, after pondering all

that happened without stripping the erroneous action from the whole, that the

judgment was not substantially swayed by the error," then we must conclude that

the error was not harmless.  *Foster*, 2021 WL 1742267, at *5 (internal quotation

11

marks omitted).  We review *de novo* the question of harmlessness.  *Granda*, 990 F.3d at 1293.

On this record, we have no grave doubt about whether Bachiller's § 924(c) conviction rested on an invalid ground.  Bachiller's conspiracy to commit Hobbs Act robbery "was inextricably intertwined with the other predicate offenses" that Bachiller concedes are still valid.  *Id* at 1293.  Based on his role in the conspiracy and attempt to rob the tractor-trailer of a stash of cocaine, the jury unanimously found him guilty of conspiracy and attempt to possess cocaine with intent to distribute, conspiracy to commit Hobbs Act robbery, and attempted Hobbs Act robbery.  As in *Granda*, which is factually very similar to this case, "[t]he trial record makes it abundantly clear that all of these findings rested on the same operative facts and the same set of events—the jury found beyond a reasonable doubt that [Bachiller] had conspired and attempted to rob the truck in order to possess and distribute the cocaine it held."  *Id.* at 1289.  Bachiller was a part of preliminary discussions between Peña and his crew about the plan to rob the tractor-trailer, met up with them before the attempted robbery and received a briefing on the plan—including that the crew was stealing cocaine and would be armed—and rode with his codefendants to the scene.  "The objective of the robbery and the [cocaine charges] was the same:  to obtain and [possess] the multi-kilogram quantity of cocaine that was to be taken by force from the truck."  *Id.*  So

12

the jury could not have concluded that Bachiller possessed a firearm in furtherance of the robbery conspiracy without also finding at the same time that he possessed the firearm in furtherance of the conspiracy and attempt to obtain the cocaine and the attempt at the robbery itself. *See id.*; *see also Foster*, 2021 WL 1742267, at *5–6 (same).

Bachiller offered an alternate theory at trial, but the jury rejected it by finding him guilty. *See Granda*, 990 F.3d at 1290–91. "And we know that the jurors did not split into two camps," *id.* at 1291, one of which found that Bachiller only possessed a firearm in furtherance of the Hobbs Act conspiracy, because no evidence suggests a split and the district court instructed the jury that it "must unanimously agree upon the way in which [Bachiller] committed the [§ 924(c)] violation," Doc. 204 at 20; *see Granda*, 990 F.3d at 1291.

Each of the predicate offenses for which Bachiller was convicted "arose from the same plan and attempt to commit armed robbery of a tractor-trailer full of cocaine." *Granda*, 990 F.3d at 1291. "The tightly bound factual relationship of the predicate offenses" precludes Bachiller from making the requisite showing for reversible error under *Brecht*. *Id.*; *see Foster*, 2021 WL 1742267, at *6. We therefore affirm the district court's denial of his § 2255 motion.

**AFFIRMED.**